IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JEFFREY STEWART, | ) | CASE NO. 4:04 CV 1852 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | WILLIAM H. BAUGHMAN, JR. |
| v. | ) | |
| | ) | |
| CITY OF NILES, *et al.*, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendants. | ) | |

## I.  Introduction

Defendants, City of Niles, its Police Department and individual "John Doe" police officers of that Department (Niles), Gold Cross Ambulance Services, Inc. d/b/a Rural Metro Ambulance (Rural Metro), Weathersfield Township and Officer Richard Bailey of the Weathersfield Township Police Department (Weathersfield), have each moved for an order of summary judgment in this matter pursuant to Federal Rule of Civil Procedure 56(c).[1] Plaintiff, Jeffrey Stewart (Stewart), has filed a single response in opposition to those three motions.[2]

Stewart's underlying claims allege that while he was in police custody, the defendants acted to deny him needed medical treatment in violation of federal and state law.[3] The case

---

[1] ECF # 18 (Niles), ECF # 16 (Rural Metro), and ECF # 19 (Weathersfield).

[2] ECF # 22.

[3] ECF # 1.

was originally brought in state court but removed by Weathersfield for raising federal questions.[4]  The parties have consented to the jurisdiction of the Magistrate Judge.[5]

The Court has completed review of the pending motions for summary judgment and the opposition thereto.  It appears for the reasons that follow that summary judgment is appropriate on some, but not all, pending claims.

## II.  Facts

Stewart testified that between the hours 9:00 p.m. and 10:00 p.m. on January 23, 2000, he drank some amount of ethylene-glycol antifreeze in his home.[6]  Stewart drank the antifreeze after consuming three beers.[7]  He testified at his deposition that he did this to "scare" his wife, who had recently taken their children and moved in with her aunt.[8]

Shortly after drinking the antifreeze and beer, Stewart said that he began to feel ill and decided to drive himself to the hospital.[9]  While driving, Stewart felt nauseated and unable to continue driving. He testified that he pulled the car to the side of the street, got out and

---

[4] *Id.*

[5] ECF # 15.

[6] ECF # 24 at 33.

[7] *Id.* at 30.

[8] *Id.* at 26-27.

[9] *Id.* at 37-39.

started walking toward a pay phone he had passed, intending to call 911 for help in reaching the hospital.[10]  While walking on the street, Stewart testified that he encountered the police.[11]

Contrary to Stewart's testimony that he was walking after he pulled his car to the side of the road, Weathersfield Officer Bailey, in his affidavit, testified that he was sent to investigate a one-car accident involving Stewart.[12]  Patrolman Allan Clay of the Niles Police Department also testified in his affidavit that, while on patrol,  he, too, encountered Stewart at the scene of a one-car accident.[13]  Both Officer Bailey and Patrolman Clay further testified that each of them smelled alcohol on Stewart's breath.[14]

Significantly for this matter, Stewart testified at his deposition that he told Officer Bailey during this initial encounter on the street that "I consumed antifreeze; I need to get to a hospital."[15]  Officer Bailey states in his affidavit that "I inquired whether Stewart needed help or medical assistance, which Stewart denied.  Stewart did not mention that he had ingested antifreeze [nor] that he had tried to commit suicide...."[16]

---

[10] *Id*. at 39-44.

[11] *Id.* at 44.

[12] ECF # 19, Ex. A.

[13] ECF # 18, Ex. A.

[14] *Id.* (Patrolman Clay); ECF #19, Ex. A (Officer Bailey).

[15] ECF # 24 at 48.

[16] ECF # 19, Ex. A.

There is an uncontested affidavit from Chief Joseph Consiglio of the Weathersfield Police that it is "standard policy" for the Weathersfield Police to summon medical help when a person in custody requests it, complains of a condition that requires it, or is obviously in need of it.[17]  Chief Consiglio further testified that all officers are trained in when to call for medical help.[18]

According to Patrolman Clay, Stewart was taken into custody on the scene by Officer Bailey who then transported him to the police station in Niles, where he was booked at approximately 1:00 a.m. on the January 24, 2000.[19]  Again, there is a direct dispute over whether Stewart told personnel at the police station that he had consumed antifreeze or asked for help to get to the hospital.

Stewart maintains in his deposition that, during the booking procedure, the Niles officers asked him about how much alcohol he had consumed but had no reaction to his claim of consuming antifreeze nor to his request for help in getting to a hospital. "I said, I told Weathersfield and I'm telling you, I need to go to a hospital.  I consumed antifreeze; I'm not drunk."[20]

---

[17] ECF # 19, Ex. B.

[18] *Id.*

[19] ECF # 18, Ex. A;  ECF # 24, Def. Ex. 1.

[20] ECF # 24 at 83.

Patrolman Clay, who is identified as the "Book In Officer" at the Niles police station on the "Booking Slate" form,[21] testified in his affidavit that "at no time did ... Stewart ever discuss[] [with] or inform[] any members of the NPD, Officer Bailey or me that he had ingested antifreeze prior to his accident and subsequent arrest...."[22]

In addition, the Niles "Officer - Prisoner Medical Questionnaire," which indicates it was completed by Patrolman Clay at the time Stewart was booked, shows, in response to the question, "Do you have any other medical problems that we should know about?", that Patrolman Clay marked Stewart's answer as "No."[23] As part of completing that form, both the booking officer and the prisoner are provided a space to sign. There is a signature above the typed name of "Stewart, Jeffery" on a copy of that form.[24]

It is not disputed that, as part of the booking process, the Niles police gave Stewart a blood alcohol test that showed him to have a blood alcohol level of .083.[25] Believing he had "passed" the breathalyzer, Stewart testified in his deposition that he soon became uncooperative with police because, he said, they continued to not believe his account of drinking antifreeze and so would not take him to the hospital. "...[T]hey didn't believe me.

---

[21] *Id.*, Def. Ex. 1.

[22] ECF # 18, Ex. A.

[23] ECF # 24, Def. Ex. 1.

[24] *Id.*

[25] ECF # 19, Ex. A.

After I had taken the breathalyzer and passed it.  That's when I got a little smart.  I told them, listen, I've told you what I've done.  Listen, I need to go to a hospital."[26]

At about that time, the Niles police decided to release Stewart into the custody of his father, since Stewart was not legally drunk.[27]  While escorting Stewart to the parking lot of the police station where his father was waiting, according to the affidavit of Patrolman Clay, Stewart "began to act in a disorderly manner"[28] such that he needed to be forced to the ground by police who used "an electronic restraining device" and "pepper spray" on him.[29]  As a consequence of sustaining some injuries during his scuffle with police, a Rural Metro ambulance was called to the Niles police station at approximately 1:00 a.m. for Stewart.[30]

The Rural Metro paramedic that responded to the call testified in her affidavit that she found Stewart "alert, coherent and oriented," with only his only visible injuries "superficial cuts and bruises."[31]  She further stated in her affidavit that she asked Stewart if he "had

---

[26] ECF # 24 at 52.

[27] ECF # 19, Ex. A.

[28] ECF # 18, Ex. A at 2.

[29] *Id.*

[30] *Id.* at 3; ECF # 17.

[31] ECF # 17.

ingested any type of drug" or "wanted to be transported to the hospital."[32] The paramedic's affidavit relates that Stewart responded in the negative to both questions.[33]

As part of attending to Stewart, the paramedic from Rural Metro testified in her affidavit that she had Stewart sign a form indicating that he had refused, among other things, "transport to specific medical facility which was deemed appropriate by the ambulance service representatives."[34]  Although no one kind of follow-up action is checked as having been specifically refused, a copy of the form filed as part of the motion for summary judgment shows a signature in the line for "patient or surrogate" that Rural Metro states is Stewart's.[35]

Stewart testified at his deposition that he does not now specifically remember anything of what happened after he had the scuffle with the police.[36]  Moreover, he also testified at his deposition that he does not recognize the signatures on either the "Jail Officer's Visual Observations" form or the Rural Metro form as being his.[37]

What is not disputed is that Stewart was not taken to a hospital after the altercation with police in the station parking lot nor was he released to his father.  Instead, he was locked

---

[32] *Id.* at 2.

[33] *Id.*

[34] *Id.*

[35] *Id.* at 4.

[36] ECF # 24 at 82-83.

[37] *Id.* at 84 (Jail Officer's form), 104 (Rural Metro form).

up at the Niles police station overnight to await a morning court appearance on charges of disorderly conduct, resisting arrest, and aggravated menacing.[38]

At 9:28 a.m. Rural Metro was again called to the Niles jail to attend to Stewart. Police officers who were trying to awaken Stewart for court had found him unresponsive and unable to walk or stand.[39] Niles Patrolman John Marshall testified in his affidavit that "for the first time" Stewart that morning told the Niles police that he had consumed antifreeze.[40] The Rural Metro paramedic on this call stated in his affidavit that upon arriving at the jail he was told by both the Niles police and Stewart that Stewart was complaining about ingesting antifreeze.[41]

After performing "several tests to determine the presence of any poison in Stewart's system," the paramedic determined that "Stewart was lying to Niles officers and had not in fact ingested antifreeze."[42] The observations in the Rural Metro run report for this trip note that Stewart was "prone on the floor" and "spitting yellow from his mouth."[43] The paramedic's affidavit also states that, notwithstanding his condition,  Stewart was

---

[38] ECF # 18, Ex. A at 3.

[39] ECF # 18, Ex. B at 2.

[40] *Id.*

[41] ECF # 17 at 2.

[42] *Id.*

[43] *Id.*

"uncooperative and verbally abuse" and "refused" to be taken to the hospital.[44]  The ambulance crew left without administering any further treatment.[45]

Ninety-seven minutes after leaving Stewart that morning, Rural Metro returned to the jail.  Niles Patrolman John Marshall's affidavit states that Stewart by then was "mumbling," having "difficulty maneuvering," and "foaming at the mouth."[46]  Stewart was thereupon taken to Trumbull Memorial Hospital,[47] where he arrived "comatose" and was admitted for "acute ingestion of antifreeze with antifreeze poisoning."[48]

### III.  Analysis

#### A.    Standard for summary judgment

The standard for granting summary judgment is well-known.  Summary judgment is appropriate where the court finds "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[49] The burden of showing the absence of any such genuine issue of material fact is with the moving party.[50] Determination

---

[44] *Id.*

[45] *Id.*

[46] ECF # 18, Ex. B.

[47] *Id.*

[48] ECF # 24, Def. Ex. 2.

[49] Fed. R. Civ. P. 56(c).

[50] *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).

of whether there is a genuine issue of material fact requires consideration of applicable evidentiary standards in reviewing supporting material.[51] Courts must evaluate the motion "in the light most favorable to the party opposing the motion."[52]

The nonmoving party may not simply rely upon its pleadings to create an issue of material fact sufficient to deny the motion but must "produce evidence that results in a conflict of material facts to be solved by a jury."[53] Fed. R. Civ. P. 65(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

As the Sixth Circuit has recently put it, "the movant can challenge the opposing party to 'put up or shut up' on a critical issue."[54]

## B.    Parties

As noted, apart from Rural Metro, Stewart is here proceeding against two Ohio political subdivisions, the City of Niles and Weathersfield Township, one named police officer of Weathersfield, Officer Bailey, and unnamed "John Doe" members of the Niles Police Department.[55]

---

[51] *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).

[52] *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

[53] *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

[54] *BDT Products, Inc. v. Lexmark Int'l Inc*. 124 F. App'x 329, 331 (6th Cir. 2005).

[55] ECF # 1.

-10-

Initially, the Court must note that Stewart has not sought within the four years his claims have been before various courts to amend his complaint to identify the "John Does." Nor has he served a summons and amended complaint upon any individual members of the Niles Police Department, thereby giving this Court personal jurisdiction over such a defendant.[56] As such, there are no cognizable claims now pending against any individual officer of the Niles Police Department before this Court.[57]

## C.    Claims

Stewart has here asserted six claims against both governmental and private entities involving both federal and state law.  In addition to denying Stewart's underlying assertions, various defendants have raised the affirmative defenses of immunity.  This Court will consider the motions for summary judgment as they relate to each one of Stewart's allegations as understood pursuant to the Court's prior finding as to the parties at bar.

***1.    Weathersfield, Officer Bailey, and Niles were negligent pursuant to Ohio law in failing to provide Stewart with needed medical care while he was in their custody.***

***2.    Weathersfield, Officer Bailey, and Niles were grossly negligent pursuant to Ohio law in failing to provide Stewart with needed medical care while he was in their custody.***

---

[56] *Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 103 (1987) (citation omitted).  *See also*, *Raiford v. Dist. of Columbia*, 116 F.3d 942, 1997 WL 358229, at *3 (D.C. Cir., May 30, 1997) (Trial court "properly found no personal jurisdiction over the John Does, who have not been served.").

[57] Arguably, any attempt to now join such officers by an amended complaint would be time-barred. *Coleman v. Dept. of Rehab. & Corrs.*, 46 F. App'x 765, 768 (6th Cir. 2002); *Cox v. Treadway*, 75 F.3d 230, 239-40 (6th Cir. 1996).

Weathersfield , Niles, and Officer Bailey base their motions for summary judgment as to the state law claims on assertions of sovereign immunity as applied by statute.[58]  They have treated Stewart's allegations in Counts One and Two of his complaint together for the purpose of arguing that all claims for personal injury against a political subdivision or an employee are governed by the operation of the sovereign immunity statute.

Accordingly, Stewart's claims in these two counts will be collectively addressed first as they apply to the political subdivisions and then to Officer Bailey.[59]

a.    *Ohio law of sovereign immunity*

Ohio law in general provides that, subject to stated exceptions, "a political subdivision is not liable in damages in a civil action for injury ... to person ... allegedly caused by an act or omission of the political subdivision or of any of its employees in connection with a governmental or proprietary function."[60]

There is no dispute that both the police function[61] and the operation of jails[62] are considered by statute to be "governmental functions" of political subdivisions.

---

[58] ECF # 18 at 14 (Niles),  ECF # 25 at 4 (Weathersfield).

[59] Stewart's pleading does not specify whether Officer Bailey is being sued in his official or personal capacity.  While potentially a significant defect, because the parties have joined the issue as if he is sued in his official capacity, it will here be considered as such.

[60] O.R.C. § 2744.02(A)(1).

[61] O.R.C. § 2744.01(C)(2)(a).

[62] O.R.C. § 2744.01(C)(2)(h).

-12-

Ohio law also states that an individual employee engaged in performing a governmental or proprietary function is "immune from liability [for injury, death or loss to person or property allegedly caused by an act or omission] unless ... (b) the employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner."[63]

### b.    Parties' argument

Weathersfield contends first that Officer Bailey is entitled to immunity under Ohio Rev. Code § 2744.03(A)(6)(b) because Stewart has not shown how he acted "with malicious purpose, in bad faith or in a wanton or reckless manner."[64]

Niles and Weathersfield have also argued that they are entitled to immunity because Ohio Rev. Code § 2744.02(B)(4) grants immunity to political subdivisions in the operation of jails.[65]

Stewart contends that a determination of whether Officer Bailey's actions were with "malicious purpose, or in bad faith, or in a wanton or reckless manner" involves a judgment by a jury as to his state of mind and so makes summary judgment inappropriate here.[66]

### c.    The political subdivisions

The Court notes initially that reliance by Niles and Weathersfield on Ohio's immunity provision as it concerns jails is misplaced. Ohio Rev. Code § 2744.02(B)(4) states:

---

[63] O.R.C. § 2744.03(A)(6)(b).

[64] *Id.  See*, ECF # 25 at 5.

[65] ECF # 25 at 4 (Weathersfield), ECF # 26 at 12-13 (Niles).

[66] ECF # 22 at 22.

> [P]olitical subdivisions are liable for injury, death, or loss to person or property that is caused by the negligence of their employees and that occurs within or on the grounds of, **and is due to physical defects within or on the grounds of, buildings** that are used in connection with the performance of a governmental function, including, but not limited to, office buildings and courthouses, but not including jails, places of juvenile detention, workhouses or other detention facilities....[67]

Niles erroneously quotes the statute by inexplicably omitting the emphasized language and then incorrectly asserts that the misquoted statute bars suits against political subdivisions for the negligent operation of their jails.[68]  Weathersfield correctly provides the full text of the statute but also erroneously contends that it makes a specific grant of immunity to subdivisions in the operation of their jails.[69]

In fact, Ohio Rev. Code § 2744.02(B)(4) creates a limited **exception** to sovereign immunity, which exception does not extend to jails, which permits suits against subdivisions for injuries caused by negligent maintenance or physical defects of property.[70]

As properly understood, Ohio Rev. Code § 2744.02(B)(4) is wholly inapplicable to the present case and, thus, creates no barrier to Stewart's cause of action against Niles or Weathersfield.

––––––––––––––––––––

[67] O.R.C. § 2744.02(B)(4) (emphasis added).

[68] ECF # 18 at 15-16.

[69] ECF # 25 at 4.

[70] This section of the Ohio Rev. Code was rewritten several times to answer objections from the Ohio courts.  The clear intent of the legislature was always to create "subsection (B)(4) as a premises-liability exception to sovereign immunity." *Hubbard v. Canton Bd. Of Educ.*, 97 Ohio St. 3d 451, 455 (2002) (Lundberg Stratton concurring in part and dissenting in part).

However, absent any specific exclusion, the general provision in Ohio law of Ohio Rev. Code § 2744.02(B) is that a "political subdivision is not liable in damages for injury ... allegedly caused by an act or omission of the political subdivision or any of its employees in connection with a governmental or proprietary function." This section does control here and does bar Stewart's state law claims of negligence and gross negligence against the political subdivisions Niles and Weathersfield.[71]

Accordingly, the political subdivisions of Niles and Weathersfield are entitled to summary judgment in their favor on Counts One and Two of Stewart's complaint.

d.      *Officer Bailey*

Stewart's claims against Bailey, however, must be further analyzed under Ohio Rev. Code § 2744.03(A)(6)(b), which provides limited immunity from intentional torts for employees of a political subdivision engaged in performing a governmental function unless they act "with malicious purpose, in bad faith, or in a wanton or reckless manner."

The court in *Feathers v. Aey* set forth the applicable definitions of the terms used in this part of Ohio law:

> "Malice" is the willful and intentional design to injure or harm another, usually seriously, through conduct that is unlawful or unjustified. "Bad faith" includes a dishonest purpose, conscious wrongdoing, or breach of a known duty through some ulterior motive. "Wanton" misconduct refers to one's failure to exercise any care whatsoever. "Reckless" refers to conduct that causes an

----

[71] *Feathers v. Aey*, 196 F. Supp. 2d 530, 541 (N.D. Ohio 2002), rev'd on other grounds, *Feathers v. Aey*, 319 F.3d 843 (6th Cir. 2003).

unreasonable risk of harm and is "substantially greater than that which is necessary to make his conduct negligent."[72]

Officer Bailey contends that Stewart has not presented any evidence that would permit a jury to find that he acted in a "reckless" manner sufficient to sustain liability against him.[73]

To survive Officer Bailey's motion for summary judgment Stewart must show that there are facts which, if construed most favorably to him, are sufficient for a jury to find in his favor on every necessary element of his claim.[74] That means that Stewart must show that there was a duty of care owed him, that Officer Bailey breached that duty "with malicious purpose, in bad faith, or in a wanton or reckless manner,"[75] and that he was damaged as a proximate result of Officer Bailey's actions.

Stewart, in his sworn deposition, alleges that he told Officer Bailey that he had consumed antifreeze and needed to go to a hospital.[76] In addition, the affidavit of Weathersfield Chief Consiglio establishes that Weathersfield police are trained to call an ambulance "when an individual in the custody of the Weathersfield Police Department requests medical attention."[77] Finally, the record contains an affidavit from Erdal

---

[72] *Id*. at 542 (citations omitted).

[73] ECF # 25 at 5-6.

[74] *McDonald v. Petree,* 409 F.3d 724, 727 (6th Cir. 2005) (citing *Celotex*, 477 U.S. at 322).

[75] O.R.C. § 2744.03(A)(6)(b).

[76] ECF # 24 at 46, 83.

[77] ECF # 19, Ex. B.

-16-

Sarac, M.D., Medical Director at the Acute Hemodialysis Unit at St. Elizabeth's Hospital in Youngstown, stating that "a patient who ingests ethylene glycol (antifreeze) can avoid dialysis treatment ... if they present to a treating facility with 3 - 4 hours after ingesting the ethylene glycol."[78]

Based on this evidence of record and considering it in a light most favorable to Stewart as the non-moving party, the Court finds that a *prima facie* case against Officer Bailey exists.

A jury could conclude from Chief Consiglio's affidavit that Weathersfield recognized a duty to ascertain and treat medical conditions of persons in its custody. Further, a jury could find Stewart's testimony credible that he told Officer Bailey of his condition and specifically alerted him to the medical seriousness of his condition. In addition, a jury could conclude that the failure of Officer Bailey to respond to a specific request for hospitalization accompanied by specific information as to the reason for the request constituted "reckless" behavior in Ohio law.

Finally, although Stewart has produced no evidence that any action by Officer Bailey caused his injury, Dr. Sarac's affidavit is sufficient to save Stewart's claim that had Stewart been hospitalized during the time he says he was asking Officer Bailey for help, *i.e.*, 3 - 4 hours after consuming the antifreeze, he would not have sustained the injuries he now has.

---

[78] ECF # 17, Doc. 3 at 2.

Accordingly, the Court must reject Officer Bailey's motion for summary judgment. However, Stewart's state law claims against Officer Bailey can proceed further only pursuant to Ohio Rev. Code § 2744.03(A)(6)(b) and only insofar as those claims concern any actions Officer Bailey is alleged to have taken during the 3 - 4 hours after 10:00 p.m., the latest time Stewart testified he consumed the antifreeze.

**3.    *Pursuant to 42 U.S.C. § 1983 Weathersfield, Officer Bailey and Niles violated Stewart's rights under the Sixth and Eighth Amendments of the U.S. Constitution, as applied by the Fourteenth Amendment to the State of Ohio, by failing to provide Stewart with needed medical care while he was in custody.***

**4.    *Pursuant to 42 U.S.C. § 1983 Weathersfield and Niles violated Stewart's rights under the Sixth and Eighth Amendments of the U.S. Constitution, as applied by the Fourteenth Amendment to the State of Ohio, by failing to train its employees in responding to requests for needed medical care by persons in their custody.[79]***

a.    *Sixth Amendment*

Stewart bases his Sixth Amendment claims on his assertion that, had he been offered access to an attorney during his arrest, he could have used that contact to seek medical attention.[80]  Weathersfield contends that a Sixth Amendment right to counsel only attaches at the initiation of adversary proceedings.[81]

---

[79] The Sixth Amendment provides, *inter alia*, for the right to counsel in criminal proceedings. The Eighth Amendment forbids cruel and unusual punishment. The Fourteenth Amendment's Due Process clause has been held to grant pretrial detainees in state custody a right to receive adequate medical care. *See*, *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001).

[80] ECF # 22 at 20.

[81] ECF # 19 at 7.

The law is clear that those arrested for misdemeanors have a right to be advised of their constitutional rights upon being taken into custody.[82]  The purpose behind advising persons in custody of their Sixth Amendment right to counsel is to protect a defendant from being compelled to be a witness against himself in violation of the Fifth Amendment.[83]

There is no Sixth Amendment right for a defendant in custody to make a phone call at the moment he is advised of his rights.[84]  The protection provided by the amendment is accomplished if the defendant refuses to participate in any interrogation until he speaks to an attorney.

Stewart's claim, therefore, that the Sixth Amendment is implicated in his being unable to make a phone call at the time of his arrest fails to state a claim upon which relief may be granted and is dismissed.[85]

*b.*     *Officer Bailey*

Initially, Officer Bailey asserts that he is entitled to qualified immunity from Stewart's claims.[86]

---

[82] *Berkemer v. McCarty*, 468 U.S. 420 (1984).

[83] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[84] *State Bank of St. Charles v. Camic,* 712 F.2d 1140, 1145 (7th Cir. 1983) (No Sixth Amendment right to make a phone call at the completion of the booking process where claim was that such a call would have averted a suicide).

[85] Fed. R. Civ. P. 12(b)(6).

[86] ECF # 19 at 6-13.

-19-

The Sixth Circuit in *Garretson v. City of Madison Heights*[87] has recently stated that, in order for a plaintiff to overcome a claim of qualified immunity in a § 1983 action, he must show the officer's conduct violated a constitutionally protected right and that such right was clearly established at the time.  Here, Stewart alleges Bailey violated his Fourteenth Amendment right to receive needed medical care by acting with "deliberate indifference" to Stewart's condition.[88]

First, a constitutional right of pretrial detainees to receive attention for medical needs is not in doubt.[89]  Accordingly, Stewart has met the first element in overcoming the claim of qualified immunity.  This right has been clearly stated since *Roberts v. City of Troy*[90] in 1985.  Stewart, thus, meets the second part of the test in that the right he alleges that Bailey violated was clearly established at the time of the alleged violation.

As to the claim itself, the court in *Garretson* [91] explained that a finding of "deliberate indifference ... has objective and subjective components."[92]  The *Garretson* court went on to state:

---

[87] *Garretson v. City of Madison Heights*, 407 F.3d 789, 796 (6th Cir. 2005).

[88] *Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005).

[89] *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2005) ("Whether a convicted prisoner or a pretrial detainee, deliberate indifference to one's need for medical attention suffices for a claim under § 1983.").

[90] *Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985).

[91] *Garretson*, 407 F.3d at 796.

[92] *Id*. at 796.

The objective component requires a showing that the alleged deprivation is sufficiently serious – that [he] was incarcerated "under conditions posing a substantial risk of serious harm."... [A]n incarcerated plaintiff who complains that a delay in medical treatment violates [his] constitutional rights must present "verifying medical evidence" to establish the detrimental effect of the delay.... [A plaintiff] must also show that officers had "a sufficiently culpable state of mind in denying [him] medical care." Deliberate indifference is not mere negligence; instead, it requires that the officers "knew of and disregarded a substantial risk of serious harm to [Stewart's] health and safety.... The official must both be aware of facts from which the inference could be drawn that a risk of serious harm exists, and he must also draw the inference."[93]

The first or "objective" portion of the *Garretson* analysis requires Stewart to provide "verifying medical evidence" to establish that any delay in furnishing medical treatment had a "detrimental effect" on him.[94]  As noted above, although Stewart has produced no "verifying medical evidence to establish the detrimental effect of the delay" as required to preserve his § 1983 claim from dismissal on summary judgment,[95] the record does contain

---

[93] *Id*. at 796-97 (citations omitted).

[94] *Id.* at 796.

[95] Stewart contends that he need not provide such "verifying medical evidence" because "no expert is necessary to advise the police or EMT's (sic) that when a man is 'spitting yellow' after many hours of complaining that he drank antifreeze, there is a good chance that he drank antifreeze." ECF # 22 at 17.  Stewart here incorrectly relies on *Blackmore*, 390 F.2d 890.  *Blackmore* holds that no verifying medical evidence is needed when "even after receiving the delayed necessary treatment, [the patient's] medical condition worsened or deteriorated." *Blackmore*, 390 F.3d at 899. The key issue here is whether Stewart can establish the "detrimental effect of delay." *Blackmore* did not need to reach that issue since it involved a medical condition that, even after delayed treatment, "worsened or deteriorated."  Dr. Sarac's affidavit, however, states that the only time when remedial action might have prevented Stewart's illness from worsening or deteriorating was during the "3 - 4 hours after ingesting the ethylene glycol."  So simply relying on the fact that officers ignored his symptoms of "spitting yellow" – which was first noted by Rural Metro at 9:00 the next morning – does not prove that any "detrimental effect" to him occurred from failing to act during his arrest and booking.

the previously noted affidavit of Dr. Sarac, submitted by Rural Metro.  That affidavit, which is uncontroverted, states that anyone receiving appropriate medical care within 3 - 4 hours of ingesting antifreeze will not need dialysis.[96]  This affidavit, construed most favorably to Stewart, satisfies the "objective" component of the *Garretson* analysis.[97]

The "subjective" aspect to the *Garretson* test has been previously reviewed in the context of Stewart's state law claims.  There is evidence which a jury could find credible that Stewart told Officer Bailey immediately upon being stopped on the street that he had ingested antifreeze and needed to be hospitalized.  In addition, Chief Consiglio's affidavit shows that the Officer Bailey would have known that a request to be taken to the hospital from a person in custody did impose a duty to act.

Considering this evidence now in the light most favorable to Stewart, Officer Bailey would have had actual knowledge of a risk of serious harm by virtue of Stewart's own statements to him.  A jury could also conclude, based on Chief Consiglio's affidavit, that Officer Bailey would have known that he had a duty to act when Stewart requested hospitalization.

Collectively, this evidence, if believed, is sufficient to establish, for purposes of surviving a motion for summary judgment, that Officer Bailey "knew of and disregarded a

---

[96] ECF # 17, Doc. 3.

[97] *Garretson*, 407 F.3d at 796.

substantial risk of serious harm" to Stewart,[98] thereby showing "deliberate indifference" to his medical needs.[99]

However, based on the uncontested testimony of Dr. Sarac that Stewart's injury had essentially occurred after 3 - 4 hours went by without treatment, no potential liability under this claim could attach to Officer Bailey for any actions taken beyond that time period.

Accordingly, summary judgment in favor of Officer Bailey is granted for any acts or omissions occurring more than 4 hours after Stewart consumed the antifreeze.

c.     *The political subdivisions*

Stewart argues that Niles and Weathersfield violated his right to receive necessary medical care while in custody by failing to adequately train its officers in meeting their responsibility in that regard.[100] Both Weathersfield and Niles respond that Stewart has failed to produce any evidence that a deficiency in training "actually caused the police officers' indifference to [his] medical needs."[101]

---

[98] *Garretson,* 407 F.3d at 797 (quoting *Watkins*, 273 F.3d at 686).

[99] *Carter*, 408 F.3d at 311.

[100] ECF # 22 at 19-20.  Although Stewart argues his claim in his response brief to the motions for summary judgment as one asserting a "failure to train," his actual complaint, ECF # 1, seems to present the § 1983 claim against the cities as one alleging they maintained a "policy or informal custom" of denying medical care to people in custody.  This represents two distinct approaches to municipal liability under § 1983.  Pursuant to Fed. R. Civ. P. 8(f), which requires that pleadings "be so construed as to do substantial justice," the Court will here consider both theories of municipal liability under § 1983 apparently presented by Stewart.

[101] *City of Canton v. Harris*, 489 U.S. 378, 391 (1989).

It is clear initially that no liability can attach to a city under § 1983 simply for employing a tortfeasor.[102]  The Supreme Court in *City of Canton*, however, did recognize that in limited circumstances a city could have liability under § 1983 "where that city's failure to train [its employees] reflects deliberate indifference to the constitutional rights of inhabitants."[103]

To prevail under the *City of Canton* standard, a plaintiff must prove "that the training program at issue is inadequate to the tasks that officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury."[104]

Here, Stewart offers no proof of any kind concerning any details of any training programs, nor evidence that any unspecified inadequacies in such undefined programs were a direct consequence of either Niles' or Weathersfield's deliberate indifference, nor, finally, any evidence that the unnamed inadequacies were "closely related to" or "actually caused" his injuries.

Instead, to sustain his claims of inadequate training, Stewart offers mere speculation that there must be some defect of training if so many officers did not respond to his requests

---

[102] *Monell v. Dept. of Soc. Servs. of New York*, 436 U.S. 658, 691 (1978).

[103] *City of Canton,* 489 U. S. at 392.

[104] *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989) (citing *City of Canton*).

for help.[105] The Court in *City of Canton* specifically held to the contrary and stated that improper training is not proved from mere allegations that individual officers acted improperly:

> That a particular officer may have been unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had more or better training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.[106]

Accordingly, without any evidence in the record sufficient to establish a recognizable claim against Weathersfield and Niles for liability under § 1983 for inadequate training, their motion for summary judgment on these claims is well-founded.

Alternatively, Stewart also appears to have fashioned his claim for municipal liability here as one based on "a policy or informal custom" to deny individuals in custody access to needed medical care.[107]

To prove § 1983 liability in a claim based on a municipal policy of denying medical care to persons in pre-trial custody, Stewart must show:

---

[105] ECF # 22 at 20. Stewart contends that the evidence in the record is "suggestive" of a "culture of deliberate indifference."

[106] *City of Canton*, 489 U.S. at 390-91.

[107] ECF # 1.

(1) a clear and persistent pattern of mishandled medical emergencies for pre-arraignment detainees; (2) notice, or constructive notice of such a pattern to the municipalities; (3) tacit approval of the deliberate indifference and failure to act amounting to an official policy of inaction; and (4) that the custom or policy of inaction was the "moving force," or direct causal link behind the constitutional injury.[108]

As was discussed earlier, Stewart has produced nothing that a fact-finder could rely upon to establish any one of these *Garretson* tests for § 1983 liability on the grounds of a constitutionally defective municipal policy.  Stewart's entire response to the motions for summary judgment here has been to postulate a different rationale for liability – a failure to train –  that has already been analyzed above.

The motion for summary judgment by the municipalities concerning Stewart's claim of § 1983 liability based on constitutionally defective municipal policy is also well-founded.

**5.     *Weathersfield, Officer Bailey, and Niles violated Stewart's rights under the Ohio Constitution in a willful and wanton manner.***

Stewart in his complaint does not specify what rights under the Ohio Constitution are alleged to have been violated nor how any violation occurred.  Nor does he do so in his combined brief in opposition to the motions for summary judgment.[109]

Similarly, no defendant has specifically identified or addressed any issue arising under a denial of rights based in the Ohio Constitution.

Stewart's reply brief seems to cast this claim not as a new constitutional one, but as a restatement of his previous statutory claims under Ohio law.  He states that his "claims

---

[108] *Garretson*, 407 F.3d at 796 (citation omitted).

[109] ECF # 22.

asserted under the statutory law of the State of Ohio are separate and distinct from those asserted under 42 U.S.C. § 1983 "because rights under state constitutions may be broader than those granted in the federal constitution."[110]

Stewart thus appears to assert this claim of a denial of state constitutional rights simply to highlight the point that Ohio has an independent constitutional basis for its statutory limitations on sovereign immunity.[111]

Whatever the merits of this argument, it remains true that Stewart here has not stated any new claim for relief.  His state law claims that the political subdivisions and Officer Bailey violated Ohio law are already present in his complaint.  No separate cause of action is stated by this count.

However, none of the defendants have directly moved to dismiss this count for failure to state a claim nor explicitly addressed it in any way in their motions for summary judgment.

Fed. R. Civ. P. 12 (f) provides that "upon the court's own initiative at any time, the court may order stricken from any pleading any ... redundant [or] immaterial ... matter."  In this instance, Stewart's state law claims against the municipalities and Officer Bailey entirely reside in Counts One and Two of his complaint.  Further, this Court has already ruled that

---

[110] *Id.* at 22-23.

[111] *Id.* at 23. ("By choosing an exception for the immunity of police officers who have acted 'recklessly,' the Ohio General Assembly has, at the very least, enacted a standard that differs from Fourth Amendment reasonableness generally....  [N]othing prohibits the state of Ohio from enacting more stringent provisions than those of the Federal Constitution.")

Ohio's sovereign immunity law governs disposition of those claims and that portions of Stewart's claims may proceed.

Accordingly, inasmuch as Count Six appears to be a rebuttal to an argument that was never made and not a recognizable cause of action, Count Six is stricken from the pleadings.

**6.      *Rural Metro and its employees were negligent in failing to transport Stewart for needed medical care and displayed reckless, willful, and wanton misconduct.***

Relying upon Ohio's First Responder's Statute,[112] Stewart alleges that Rural Metro and the employees who were dispatched to attend to his situation "acted with a purpose not to discharge their duties **or** with reckless disregard for Mr. Stewart's safety."[113] Rural Metro asserts that it is immune from liability on simple negligence, that its conduct was not willful or malicious, and that it did nothing to proximately cause Stewart's injuries.[114]

Ohio Rev. Code § 4765.49(A) provides:

> A first responder ... emergency medical technician-paramedic is not liable in damages in a civil action for injury ... to person ... resulting from the individual's administration of emergency medical services, unless the services are administered in a manner that constitutes willful or wanton misconduct.

Both Rural Metro and Stewart agree that this is the relevant law. Rural Metro further contends, without objection by Stewart, that its EMTs are duly licensed emergency medical technician-paramedics under Ohio law and so covered by this statute.[115]

---

[112] O.R.C. § 4765.49(A)

[113] ECF # 22 at 26 (emphasis in original).

[114] ECF # 16 at 9.

[115] *Id.*

Initially, Rural Metro contends that this statute bars recovery for merely negligent acts.[116] Stewart agrees, stating that "Ohio's first responder statute requires only that a plaintiff prove that an EMT's [sic] misconduct was either willful **or** wanton."[117]  Accordingly, Rural Metro's motion for summary judgment insofar as it concerns any claims of mere negligence is well-founded.

As to the allegation that Rural Metro displayed reckless, willful or wanton misconduct[118] in treating Stewart, the Court notes that the scope of the inquiry here must be limited, as it was for other elements of Stewart's complaint, to any action or omission which, if proved, could have injured Stewart.

The unchallenged affidavit of Dr. Sarac is that a patient who consumes antifreeze can be treated without dialysis "only if they present to a treating facility within 3 - 4 hours after ingesting the ethylene glycol."[119]  In this case, Rural Metro made three trips to the Niles police station on Stewart's behalf: the first at approximately 1:00 a.m. on January 24, 2000,[120] or 3 hours after the latest time Stewart testified that he consumed the antifreeze; the second

---

[116] *Id.*, citing *Denham v. City of New Carlisle*, 138 Ohio App. 3d 439, 443-44, 741 N.E.2d 587, 590-91 (2000).

[117] ECF # 22 at 26 (emphasis in original).

[118] Stewart's complaint, ECF # 1, presents these claims in the conjunctive; he argues them in his motion in opposition, ECF # 16, in the disjunctive.

[119] ECF # 17, Ex. 3.

[120] ECF # 17, Ex. 1.

at approximately 9:30 a.m.,[121] or nearly 12 hours after the antifreeze was ingested; and then again at 11:30 a.m. that day.[122]

Dr. Sarac concluded his affidavit with his opinion "within a reasonable degree of medical certainty that Mr. Stewart would have required the same treatment regardless of whether Rural Metro transported [him] to the hospital at 9:30 a.m. or 11:30 a.m. on January 24, 2000."

As discussed earlier, Stewart bears the burden when seeking to prevent summary judgment of establishing the existence of genuine issues of material fact as to necessary elements of his claim.  His failure to introduce any medical evidence whatsoever means that Dr. Sarac's assessment of the time frame available for preventing injury stands unrebutted in the record.  Therefore, Rural Metro is entitled to summary judgment as a matter of law for all claimed actions or inactions related to the second and third responses on January 24, 2000.

As to the initial Rural Metro response at 1:00 a.m., only Stewart's deposition testimony that he does not recognize his signature on the Rural Metro run report – which allegedly documents that Stewart refused transport to a hospital – exists to create an issue as to whether Rural Metro acted willfully or wantonly.  Unlike the situation involving the cities and Officer Bailey, Stewart testified that he has no recollection of speaking to the Rural Metro paramedics or advising them of his condition.[123]

---

[121] ECF # 17, Ex. 2.

[122] ECF # 18, Ex. 3.

[123] ECF # 24 at 103-07.

Questions of credibility, such as Stewart's claim that he does not recognize his purported signature on the Rural Metro run report, are properly matters for the jury. Accepting Stewart's deposition in the light most favorable to him, a jury could conclude that Rural Metro acted willfully or wantonly or recklessly in improperly relying on an invalid verification  that Stewart did not want to go to the hospital at 1:00 a.m. on January 24, 2000, or, if Stewart was not then competent to understand and waive his opportunity for hospitalization, that the Rural Metro EMTs acted willfully, wantonly or recklessly by relying on the consent of one in that condition.[124]

## IV. Conclusion

Accordingly, the Court first notes that it has no personal jurisdiction over any John Doe defendant referred to in Stewart's complaint.

Further, defendants' motions for summary judgment are hereby granted in part and denied in part as follows:

- • All claims asserted against the City of Niles are dismissed;

- • All claims against the Township of Weathersfield are dismissed;

- • The claims against Officer Bailey, construed to have been made against him in his individual capacity, may proceed, as to state claims, only pursuant to Ohio Rev. Code § 2744.03(A)(6)(b), and, as to both the

---

[124] *See*, *Weber v. City Council of Huber Heights*, No. 18329, 2001 WL 109196 (Ohio Ct. App. Feb. 12, 2001) (reversing summary judgment for EMTs where EMS run sheet stated that patient did not want to go to the hospital but patient's deposition testimony contradicted that).

state and federal claims, only insofar as they concern any actions taken within four hours after Stewart consumed the antifreeze;

•      Claims against Rural Metro may proceed only pursuant to Ohio Rev. Code § 4765.49(A) and only insofar as they concern the first ambulance response to Stewart; claims relating to subsequent runs are dismissed.

Moreover, Count Six is ordered stricken as redundant and immaterial pursuant to

Fed. R. Civ. P. 12(f).

IT IS SO ORDERED.


Dated:   November 23, 2005                     s/ William H. Baughman, Jr.
                                               United States Magistrate Judge

-32-